UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
SCOTT B. NAYLOR,                      :
        Plaintiff,                    :
                                      :
            v.                        :     File No. 1:08-CV-95
                                      :
ROTECH HEALTH CARE INC.,              :
        Defendant.                    :
_____:
```

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Paper 25)

I. Introduction

Plaintiff Scott B. Naylor was terminated from his job with Defendant Rotech Health Care on December 22, 2006. Naylor filed this action on March 20, 2008, alleging wrongful termination (Count I) and that his termination constituted unlawful retaliation under Vermont's Fair Employment Practices Act, 21 V.S.A. § 495, et seq. (Count II) and malicious conduct warranting a punitive damages award (Count III). For the following reasons, Defendant's Motion for Summary Judgment dismissing Plaintiff's claims (Paper 25) is GRANTED in part and DENIED in part.

II. Factual Background

Plaintiff Scott B. Naylor ("Naylor") began working for Community Care, a home health services company, in 1995. Defendant Rotech Health Care, Inc. ("Rotech") purchased Community Care in 2000, and Naylor continued to work there until Rotech

1

terminated his employment in December 2006.  Rotech provides medical equipment and services nationally, including respiratory products and related services.

Naylor held various positions with Rotech, including customer service representative, warehouse manager, shipping/receiving employee and delivery employee.  In 2004, Rotech promoted Naylor to Location Manager in its White River Junction office.  As a location manager, Naylor supervised employees, including two respiratory therapists, who delivered oxygen tanks and medical equipment to clients such as the Veterans Administration ("VA").  At times Naylor also made deliveries.  Naylor's direct supervisor in this position was initially Area Manager Jack Brozaitis, and then from 2005 to 2006 Robert Truesdale.

The Rotech White River Junction office had three delivery vehicles, each of which was assigned a company gas card.  When a company vehicle had mechanical problems, the office rented a replacement vehicle, and when employees could not rent a replacement, they would use their personal vehicles.  Rotech had a written policy that a gas card could only be used to fuel its assigned vehicle.  For practical reasons, Area Managers Brozaitis and Truesdale did not enforce this policy because employees had to fuel replacement vehicles.  Brozaitis and Truesdale also

authorized Naylor and other employees to fuel their personal vehicles with a company gas card when used as replacement vehicles for business. When Naylor and other employees did not use the gas card to fuel replacement vehicles, they submitted expense reports to obtain reimbursement.

Truesdale left Rotech in 2006, and for a period of time thereafter Naylor had no supervising Area Manager. During this interim, Naylor sent VA patients' complaints about Rotech's services, primarily concerning faulty oxygen cylinders, directly to the VA, rather than through Rotech. These complaints generally result in a "charge back" to Rotech, and some of them included potential health hazards resulting in complaints by the VA to Rotech.

In late 2006 after Truesdale's departure, Tim Miles, a Rotech director, emailed Naylor stating company gas cards should not be used for personal vehicles. Naylor responded to Miles that he had permission in the past to use the gas card to fuel his vehicle when on company business. Naylor understood Miles's concern was using the gas cards in personal vehicles for non-business travel, which Naylor claims he has never done. Miles contends he warned Naylor that gas cards should never be used to fuel personal vehicles, even if on company business.

In early December 2006, Naylor was interviewed by Rotech's legal counsel about a lawsuit against Rotech by Sheila Newton Ward, a respiratory therapist. Naylor "defended" his former co-worker in the interview and stated it "was not 'right' for the company to let her go because she had filed a request for medical leave of absence."

In late December 2006, two company vehicles were in repair, and only one replacement could be rented. On December 22, 2006, Naylor made a delivery to a patient using his own truck, and fueled it using a company gas card assigned to one of the vehicles in repair. Naylor was fired shortly thereafter "without any warning" and "was not afforded any progressive disciplinary measure or an opportunity for investigation."

Rotech informed Naylor he was fired for using the company gas card to fuel a personal vehicle. Naylor alleges Rotech terminated his employment in retaliation for jeopardizing Rotech's contract with the VA by lodging complaints about its services and for supporting Sheila Newton Ward.

III. Discussion

    A.    Motion for Summary Judgment

Summary judgment is warranted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

4

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The burden of demonstrating that no genuine issue of material fact exists lies with the party seeking summary judgment. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000). Where a motion for summary judgment is supported by affidavits and other documentary evidence, however, the opposing party must set forth specific facts showing there is a genuine, material issue for trial. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994). The court draws all factual inferences in favor of the non-moving party. Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998).

    B.    <u>Breach of Implied Contract Claim</u>

Naylor claims Rotech's Employee Handbook creates an implied contract to terminate employment only for just cause and Rotech's wrongful termination breached that contract. Rotech asserts summary judgment is appropriate on this claim because the Employee Handbook does little more than memorialize the basic concepts of at-will employment and implies no promise to

5

terminate except for just cause. Rotech also argues that even if the Handbook's provisions create such a contract, Naylor was fired for cause.

Under Vermont law,[1] general rules of contract construction create a presumption that employment for an indefinite term is "at-will." Dillon v. Champion Jogbra, Inc., 175 Vt. 1, 5, 819 A.2d 703, 707 (2002). "At will" employment relationships are "terminable at any time, by either party, for any reason or for no reason at all." Trombley v. Southwestern Vt. Med. Ctr., 169 Vt. 386, 738 A.2d 103, 108 (1999). Thus, at-will employees are generally barred from bringing wrongful discharge claims. Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1242 (2d Cir. 1995) (applying Vermont law).

Consistent with general contract principles, however, there is "no substantive limitation on the right of contracting parties to modify terms of their arrangement or to specify other terms that supersede the terminable-at-will arrangement." Dillon, 175 Vt. at 5 (citing Foote v. Simmonds Precision Prods. Co., 158 Vt. 566, 570, 613 A.2d 1277, 1279 (1992)). Indeed, an employer may modify an at-will employment agreement unilaterally by implementing written policies or practices inconsistent with at-will employment. Id (citing Benoir v. Ethan Allen, Inc., 147

---

[1] Vermont law governs this diversity action. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817 (1938).

Vt. 268, 270, 514 A.2d 716, 717-18 (1986)).  Whether an employer's written policies or practices modify the parties' at-will relationship is typically an issue for the court to decide. Id at 7 (citing "long-standing law of contract that the interpretation of unambiguous writings is a matter of law for the court).  "When the terms of a manual are ambiguous, however, or send mixed messages regarding an employee's status, the question of whether the presumptive at-will status has been modified is properly left to the jury." Id (citing Farnum v. Brattleboro Retreat, Inc., 164 Vt. 488, 494, 671 A.2d 1249, 1254 (1995)).

    Naylor contends the Employment Handbook sent sufficient "mixed messages" concerning Rotech's use of progressive discipline so that the Court should submit the issue to a jury in this case. The Court agrees.  Under Vermont law, one way an employer may unilaterally alter an employment contract is by instituting a progressive discipline policy.  The Vermont Supreme Court has held that such policies are generally inconsistent with at-will employment.  See Dillon, 175 Vt. at 8 (handbook modified employment contract where it "established three categories of violations of company policy and corresponding actions to be generally taken in each case" and "delineates progressive steps to be taken for certain types of cases"); Cf. Taylor v. Nat'l Life Ins. Co., 161 Vt. 457, 461-62,

652 A.2d 466, 469-70 (1993) (manual provisions stating progressive discipline should be used except in cases of serious conduct and listing circumstances that may result in termination were sufficient to support a jury determination that employer unilaterally modified at-will employment agreement to require cause for termination).

Rotech's Employee Handbook states, in a section entitled "Termination," that "[u]nder normal circumstances, an employee will have gone through the constructive disciplinary process . . . ." The Handbook states "decisive action" will be taken, "[w]hen the violation of Company policy is serious enough to warrant termination from employment." Such language arguably sends mixed messages to employees about whether Rotech employees can be fired at any time, for any reason or for no reason at all.

Moreover, the Handbook sets out a detailed progressive discipline process in a section entitled "Constructive Disciplinary Process." That section leads off by assuring employees that "[i]n most instances, Rotech will not take disciplinary action against employees without first having conducted an objective analysis of the facts allowing employees the opportunity to explain their actions." The Constructive Disciplinary Process is two-fold. The first part consists of "Informal Job Performance Discussions" which "serve as an

8

opportunity for employees to receive specific information about what is working well and what may need to be improved or changed."

The second part is a three-step warning and disciplinary procedure. The first step is "Initial Counseling," where "supervisors will meet with their employees to discuss the inappropriate behavior or performance problem." In Step 2, "[i]f the problem is not corrected within the specific time period, or a similar problem arises, supervisors will issue a reminder" and a copy of the warning is placed in the employee's file. In Step 3, "Final Warning," "employees will receive, at the discretion of their supervisor a final written warning that may include a one to three day unpaid . . . suspension." Employees who do not correct the specified offending behavior or incur any other disciplinary reprimand will be terminated.[2]

Rotech argues the Handbook's provisions do not create an enforceable promise to engage in Constructive Discipline or to terminate only for cause and points to numerous disclaimers stating employment with Rotech is at-will. Under Vermont law, however, "[t]he mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an

---

[2]This is only a brief summary of the three-step process.

9

employee handbook." Farnum v. Brattleboro Retreat, Inc., 164 Vt. 488, 494, 671 A.2d 1249 (1995). Rather, disclaimers "must be evaluated in the context of all the other provisions in the handbooks and any other circumstances bearing on the status of the employment agreement." Id. at 495, 671 A.2d 1249.

Considering the Handbook as a whole, the Court finds it sends mixed messages regarding Rotech's commitment to its Constructive Discipline Process. While Rotech includes disclaimers reserving its discretionary right to end employment at any time, these statements are at times coupled with conflicting assurances that "under normal circumstances" and "in most instances" Rotech will engage in constructive discipline. Because Rotech's Handbook sends mixed messages and genuine issues of material fact remain concerning whether Naylor was terminated for cause, the Court denies Rotech's Motion for Summary Judgment on Plaintiff's wrongful termination claim (Count I).

C.  Retaliatory Discharge Claim

Naylor claims his termination was in retaliation for his complaints to the VA and support of co-worker Sheila Ward, and that such retaliation violates Vermont's Fair Employment Practice Act ("FEPA"). 21 V.S.A. § 495(a)(5). Under Vermont's FEPA statute, it is unlawful

> [f]or any employer . . . to discharge or in any other manner discriminate against any employee because such employee has lodged a complaint of discriminatory acts or practices <u>or has cooperated with the attorney general or a state's attorney in an investigation of such practices</u>, or is about to lodge a complaint or cooperate in an investigation, or because such employer believes that such employee may lodge a complaint or cooperate with the attorney general or state's attorney in an investigation of discriminatory acts or practices.

<u>Id.</u> (emphasis added).

Naylor acknowledges his complaints to the VA and support of Ward are not squarely protected activity under FEPA, because the statute expressly refers to an employee's cooperation with the attorney general or a state's attorney investigation. (Paper 27.) Naylor asks the Court, however, to read the statute "broadly to protect employees against retaliation for actual or potential cooperation with not only the attorney general or state's attorney but also the aggrieved employee who is also authorized to enforce FEPA." <u>Id.</u> He reasons that FEPA's purpose is frustrated if employers can fire with impunity employees who may cooperate in a potential or pending FEPA claim simply because the claim is enforced by an employee rather than the state.

This argument is compelling, but Naylor cites no cases to support this interpretation of FEPA. The Court must apply the law as written and enacted by Vermont's legislature. Naylor's activities were not carried out in "cooperat[ion] with the attorney general or a state's attorney in an investigation." 21

11

V.S.A. 495(a)(5). The Court therefore GRANTS Rotech's Motion for Summary Judgment in part and DISMISSES Plaintiff's FEPA claim (Count II).

    D.    <u>Punitive Damage Claim</u>

Numerous genuine issues of material fact remain in this case. The Court therefore finds a ruling of summary judgment on Plaintiff's punitive damages claim is premature, and DENIES Defendant's Motion for Summary Judgment on Count III.

IV.  <u>Conclusion</u>

Accordingly, Defendant's Motion for Summary Judgment dismissing Naylor's claims (Paper 25) is GRANTED as to Plaintiff's FEPA claim (Count II) but DENIED as to Plaintiff's wrongful termination and punitive damage claims (Counts I and III).

The parties shall arrange for an ENE session to be conducted with the evaluator, P. Scott McGee, III, Esq., within 30 days. They shall inform the Court, in writing, by June 30, 2009, of the date selected for the session.

    SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 16th day of June, 2009.

                                       /s/ J. Garvan Murtha
                                       J. Garvan Murtha
                                       United States District Judge